# United States Court of Appeals
## For the Eighth Circuit

_____

Nos. 18-3695/19-1157
_____

Dolgencorp, LLC

*Petitioner/Cross-Respondent*

v.

National Labor Relations Board

*Respondent/Cross-Petitioner*

_____

Cross-Petitions for Review and Enforcement of an Order
of the National Labor Relations Board

_____

Submitted: September 24, 2019
Filed: February 13, 2020

_____

Before GRUENDER, ARNOLD, and GRASZ, Circuit Judges.

_____

GRASZ, Circuit Judge.

Dolgencorp, LLC, petitions for review of the National Labor Relations Board's ("Board") order, wherein the Board concluded Dolgencorp engaged in an unfair labor practice in violation of sections 8(a)(1) and (5) of the National Labor Relations Act ("Act"), 29 U.S.C. § 158(a)(1), (5), by refusing to recognize United Food and Commercial Workers, Local 655 ("Union") as the exclusive collective-bargaining

representative for some of its employees. The Board cross-petitions for enforcement of its order. We deny Dolgencorp's petition and grant the Board's petition.

## I. Background

Dolgencorp operates thousands of Dollar General retail stores. In November 2017, its Dollar General store in Auxvasse, Missouri, employed a sales staff of six: three lead sales associates and three sales associates. Adam Price, a lead sales associate, became upset with the company when it decided to reduce his and other sales associates' work hours. Price contacted the Union and spoke with Billy Myers, an organizing director, who told Price to ask his coworkers if they were interested in unionizing. Price spoke to Jennifer Miles, Joanna Durlin, and Alan Bloom. About one week later, Price called Myers and told him four sales staff employees were interested.

On November 13, 2017, Myers traveled to Auxvasse to collect signed union authorization cards from the interested employees. He met Price and Miles at a gas station convenience store, and they signed authorization cards after Myers provided some basic information about unions and the unionization process. He and Price then went to the Dollar General store to meet Bloom, and Bloom signed an authorization card during his break. Finally, Myers and Price met Durlin at her home, and she also signed an authorization card after Myers answered her questions about the unionization process. On November 14, Myers filed an election petition with the Board, and the Union and Dolgencorp agreed to the terms of an election to be held on December 8, 2017.

On November 17, 2017, Myers created a group text message conversation between himself, Price, Miles, and Durlin, telling them he would be on vacation the following week and one of his colleagues would fill in for him. Bloom was not included because he did not own a cell phone. Through the election date, Myers used

the same group message thread to update the others and arrange meetings. Miles and Durlin actively participated in the group text conversations and never expressed opposition to Union representation. They only expressed support. They also never told Price or Myers, in the group texts or otherwise, they no longer supported Union representation.

Myers visited Auxvasse again the week of November 28, 2017, to meet with Price, Miles, Durlin, and Bloom, and once more on December 8, 2017, to attend the election. When he was not in Auxvasse, Myers considered Price and Miles to be his "contacts," and, prior to the election, he informed the group that Price would distribute the Union's survey regarding items they may want included in a collective bargaining agreement. Durlin viewed Price as the lead Union supporter and believed the other employees also viewed him that way.

On December 8, 2017, the six eligible employees voted to unionize by a count of 4-2. Immediately after the election, Dolgencorp's vice president of human resources, Kathleen Reardon, noticed Miles and Durlin talking in an aisle at the Dollar General store, and Miles waived her over. Miles and Durlin told Reardon they voted in favor of the Union but wanted to change their votes because Price and Myers pressured them to support the Union. They moved to a private room in the store, and Miles explained Price previously threatened to slash her tires if she voted against the Union. Durlin said Price promised to pay her $100 if she voted for the Union.

On December 14, 2017, Dolgencorp filed timely objections to the election with the Board alleging Price acted as an agent of the Union and engaged in misconduct that materially affected the result of the election. The Board held an evidentiary hearing on January 3, 2018.

Dolgencorp's first objection alleged that at some point between November 14 and December 8, 2017, i.e. between the filing of the election petition and the election,

Price threatened to "slash the tires of any individual who did not vote for the Union." Its second objection alleged Price offered "$100 to any employee who voted for the Union." Both objections alleged Price engaged in this conduct as an agent of the Union.

The Hearing Officer issued a report recommending that the Board overrule both of Dolgencorp's objections. The Hearing Officer's report first concluded Dolgencorp failed to establish Price acted as a Union agent under a theory of apparent authority and consequently reviewed his alleged misconduct under the standard applicable to third-party employees. He then recommended overruling Dolgencorp's first objection because Price's tire-slashing threat, if made at all, occurred "outside of the critical period[,]" which the Board defines as the period between the filing of the election petition and the election. *See generally Cedars-Sinai Med. Ctr. & Cal. Nurses Assoc.*, 342 N.L.R.B. 596, 598 n.13 (2004) ("As a general rule, the period during which the Board will consider conduct as objectionable (i.e., the 'critical period') is the period between the filing of the petition and the date of the election.") (citing *Ideal Elec. & Mfg. Co.*, 134 N.L.R.B. 1275, 1278 (1961)). Although Miles testified Price made the threat within the critical period, the Hearing Officer credited Price's testimony to the contrary.

The Hearing Officer also recommended overruling Dolgencorp's second objection, again crediting Price's testimony. Price acknowledged he offered Durlin $100, but testified he offered to loan Durlin the money because she was upset and worried about her finances after Dolgencorp reduced her work hours. Relying on his credibility determination, the Hearing Officer concluded "the context of offering $100 was not contingent on voting yes in the upcoming election."

The Hearing Officer's report also addressed Dolgencorp's allegation that Price attempted to intimidate Durlin during the evidentiary hearing. After the hearing concluded on January 3, the Board's regional director ordered it be reopened for

-4-

further hearing on Dolgencorp's allegation. Durlin testified she overheard Price tell Bloom he thought the Hearing Officer's witness-sequestration order was pointless because he could later read a transcript of the hearing. Price made this comment in the lobby of the waiting area fifteen feet away from Durlin. The Hearing Officer found Price misunderstood the purpose of the witness-sequestration order and concluded he neither violated that order nor attempted to intimidate Durlin with his comment.

Dolgencorp filed exceptions to the Hearing Officer's report. The Regional Director followed the Hearing Officer's recommendations and overruled Dolgencorp's objections, concluding Price did not act as an agent of the Union; Price's tire-slashing threat was not grounds to set aside the election because it occurred outside the critical period, if at all; and Price's offer of a $100 loan to Durlin was not objectionable conduct. She also agreed with the Hearing Officer that Price's comment during the hearing was not an attempt to intimidate Durlin and had no effect on the credibility of his testimony. Accordingly, the Regional Director certified the Union as the exclusive representative of all the lead sales associates and sales associates at the Auxvasse Dollar General store. The Board denied Dolgencorp's request for review of the Regional Director's decision.

Dolgencorp nevertheless refused to recognize the Union as the employees' collective-bargaining representative based on its objections to the validity of the election, and the Board's general counsel issued an unfair-labor-practice complaint alleging Dolgencorp's refusal violated sections 8(a)(1) and (5) of the Act. The Board granted the general counsel's motion for summary judgment. Its summary judgment order concluded Dolgencorp engaged in the complained-of unfair labor practice and directed Dolgencorp to recognize and bargain with the Union. Dolgencorp petitions for review of the Board's summary judgment order, *see* 29 U.S.C. § 160(f), and the Board cross-petitions for enforcement, *see* 29 U.S.C. § 160(e).

## II.  DISCUSSION

### A.  Standard Governing Review of the Board's Certification Decision

"[A]n employer may obtain judicial review of the Board's certification decision by refusing to bargain and defending the ensuing unfair labor practice charge on the ground that the election was flawed." *Warren Unilube, Inc. v. NLRB*, 690 F.3d 969, 973 (8th Cir. 2012) (citing *Boire v. Greyhound Corp.*, 376 U.S. 473, 477 (1964)). When this approach is taken, the record of the Board's certification proceeding, including the evidentiary hearing, is properly before the court. *Id.* (citing 29 U.S.C. § 159(d)).

This court will enforce the Board's summary judgment order so long as its underlying certification decision "correctly applied the law and its factual findings are supported by substantial evidence on the record as a whole, even if we might have reached a different decision had the matter been before us de novo." *Tschiggfrie Props., Ltd. v. NLRB*, 896 F.3d 880, 884 (8th Cir. 2018) (quoting *ConAgra Foods, Inc. v. NLRB*, 813 F.3d 1079, 1084 (8th Cir. 2016)). Like other factual findings, credibility determinations are reviewed for substantial evidence on the record as a whole. *ConAgra Foods*, 813 F.3d at 1084 & n.4 (citing 29 U.S.C. § 160(f) and *Town & Country Elec., Inc. v. NLRB*, 106 F.3d 816, 819 (8th Cir. 1997)). We "defer to the Board's interpretation of the Act so long as it is rational and consistent with that law, but review de novo all other legal conclusions." *Tschiggfrie Props.*, 896 F.3d at 884 (cleaned up). Substantial evidence "means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *ConAgra Foods*, 813 F.3d at 1084 (quoting *NLRB v. La-Z-Boy Midwest*, 390 F.3d 1054, 1058 (8th Cir. 2004)).

Dolgencorp challenges the Board's certification decision, arguing the election was flawed because Price separately engaged in threatening and nonthreatening conduct as a Union agent that materially affected the outcome of the election, which

turned on just one vote. Dolgencorp also maintains Price's hearing testimony lacks credibility based on his comment about the witness-sequestration order during the evidentiary hearing.

We do not set aside representation elections lightly, and the party challenging the election must carry the "heavy burden" of showing with "specific evidence not only that improprieties occurred, but also that they interfered with employees' exercise of free choice to such an extent that they materially affected the election results." *Cargill, Inc. v. NLRB*, 851 F.3d 841, 850 (8th Cir. 2017) (quoting *Millard Processing Servs., Inc. v. NLRB*, 2 F.3d 258, 261 (8th Cir. 1993) and *Warren Unilube*, 690 F.3d at 974). "In evaluating claims of election misconduct, the Board and the Eighth Circuit have distinguished between misconduct committed by a union representative or agent and misconduct committed by third parties." *Overnite Transp. Co. v. Highway, City & Air Freight Drivers*, 105 F.3d 1241, 1246 (8th Cir. 1997). "When misconduct is directly attributable to the union, the Board will overturn the election when the 'conduct reasonably tend[ed] to interfere with the employees' free and uncoerced choice in the election.'" *Millard Processing*, 2 F.3d at 261 (quoting *Pepsi-Cola Bottling Co.*, 289 N.L.R.B. 736 (1988), *overruled on other grounds by Randell Warehouse of Ariz., Inc.*, 328 N.L.R.B. 153 (1999)) (alteration in *Millard Processing*). But "[e]lection results will not be overturned on the basis of objectionable conduct by employees or third parties unless that conduct created 'an atmosphere of fear and reprisal such as to render free expression of choice impossible.'" *Cargill*, 851 F.3d at 850 (quoting *Millard Processing*, 2 F.3d at 261).

## B. Price's Credibility

At the outset, we briefly address Dolgencorp's contention that the Board should not have credited any of Price's hearing testimony based on his allegedly intimidating comment about the witness-sequestration order during the evidentiary hearing. In the waiting area outside the proceeding, Price told Bloom he thought the Hearing

Officer's witness-sequestration order was pointless because he could eventually read the hearing transcript anyway. Durlin overheard the comment fifteen feet away, and Dolgencorp alleged Price attempted to intimidate her. The Board concluded Price's comment was insufficient to undermine his credibility, finding he simply misunderstood the purpose of the sequestration order and did not make the comment to intimidate any witnesses.

Price and Bloom testified they remembered Price commenting that they would be able to read the hearing transcript. However, Price testified the comment was not directed at Durlin, and Bloom testified that he did not understand the comment to be directed at anyone other than him. Based on the record as a whole regarding this comment, substantial evidence supports the conclusion that Price did not make it to intimidate Durlin or to influence her hearing testimony.

## C. Agency

Next, we address the Board's threshold conclusion that Price did not engage in the alleged misconduct as a Union agent. To establish an agency relationship, Dolgencorp advanced a theory of apparent authority. "In determining whether an individual was acting as an agent of a union for . . . purposes of the Act, we apply general common law principles of agency." *Millard Processing*, 2 F.3d at 262. "Apparent authority results from a manifestation by a principal to a third party that reasonably leads a third party to believe that another person is acting as the principal's agent." *Id.* "[T]he principal must either intend to cause the third party to believe that the agent is authorized to act for it, or should realize that its conduct is likely to create such a belief." *Id.* Agency is a question of fact, and Dolgencorp "bears the burden of establishing its existence." *Id.*

Dolgencorp's apparent-authority theory is flawed to the extent it relies on Price's own unilateral conduct, like the fact that Price initiated contact with the

Union, volunteered to keep in touch with Bloom because he had no cell phone, and openly supported the Union throughout the critical period. These actions are not manifestations *from the Union*, and simply "engaging in union campaign activity" does not establish apparent authority to act on the Union's behalf. *Id.* at 263. Dolgencorp's reliance on Myers's hearing testimony that Price was one of Myers's "contacts" is also misplaced because Myers testified that Miles was also one of his contacts, and there is no evidence Myers told anyone Price was his contact, exclusive or otherwise. *See id.* at 262 ("Only information actually communicated to and known by a third party can establish apparent authority."). Thus, these facts do not support Dolgencorp's apparent-authority theory.

Dolgencorp identifies only tenuous, if not irrelevant, manifestations from the Union, like the fact that Price accompanied Myers on his initial meetings with the other employees who signed authorization cards and that Myers asked Price to distribute the Union's survey material to the same employees. Dolgencorp also argues Myers visited Auxvasse only three times — once for the election — leading the employees to believe Price had the authority to act on the Union's behalf when Myers was not physically present. Yet, Myers updated and stayed in regular contact with the other employees throughout the unionization process using group text messages. And when Myers went on vacation in November, he told the employees his Union colleague, not Price, would help them in his absence.

Based on this record, a reasonable mind might accept the Board's conclusion that Dolgencorp failed to establish an agency relationship under a theory of apparent authority. The Board's agency determination is therefore supported by substantial evidence, and the Board appropriately reviewed Price's alleged conduct under the standards applicable to non-agent third-party employees. *See ConAgra Foods*, 813 F.3d at 1084 (Substantial evidence "means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.").

### D.  First Objection

We now turn to the Board's decision to overrule Dolgencorp's first objection related to the alleged tire-slashing threat.  The Board found that if Price threatened to slash anyone's tires, the threat occurred on November 11, 2017, three days before Myers filed the election petition and outside the critical period.  Citing *Ideal Electric & Manufacturing Co.*, the Board concluded objectionable conduct occurring outside the critical period is not grounds for setting aside the election.  134 N.L.R.B. at 1278 ("[T]he date of filing the petition . . . should be the cutoff time in considering alleged objectionable conduct in contested cases.").  Dolgencorp argues the Board's factual finding is not supported by substantial evidence and its application of *Ideal Electric* was erroneous.

In her written statement, Miles stated Price made the tire-slashing threat "roughly a week or so before" the election.  Then at the evidentiary hearing, Miles testified it was "[m]aybe two weeks" before the election, but she was "not sure of the timeline" because "[e]verything happened so quickly."  During cross-examination, the Hearing Officer again asked Miles about the date of the alleged threat.  Using November 27, 2017, the day Miles remembered volunteering to be the Union's election observer, as a reference point, the Hearing Officer asked Miles whether Price made the threat before or after that date.  Miles responded she could not remember.  However, she claimed Price made the threat during a gathering at her home for employees that signed authorization cards.  And Price testified he could provide "the exact date" of the gathering by checking his phone for the date he received the text message from Miles inviting him to her home.  After checking his phone, Price testified the gathering was on November 11, 2017, which he stated was the only time he visited Miles's home.

The Board credited Price's testimony and found that if he made the tire-slashing threat, he made it on November 11, outside the critical period.  Dolgencorp

argues this finding is not supported by substantial evidence because the gathering at Miles's home was for employees who had signed authorization cards. Dolgencorp reasons the evidence shows the employees signed authorization cards on November 13, therefore the gathering necessarily occurred after that date and within the critical period. The Board dismissed this argument, explaining "[i]t is just as likely that the party was intended to be a coming together of those employees who intended to sign cards as it was intended to be a coming together of employees who had signed cards."

After affording due deference to the Board's credibility determination and considering the record as a whole, we conclude the Board's finding that Price's alleged tire-slashing threat was made, if at all, before the critical period is supported by substantial evidence. *See ConAgra Foods*, 813 F.3d at 1084.

Alternatively, Dolgencorp argues that even if Price made the threat before the critical period, the Board erroneously applied the legal principle from *Ideal Electric* that conduct occurring before the critical period is not a basis for setting aside an election. 134 N.L.R.B. at 1278. However, Dolgencorp failed to preserve this argument. "Under section 10(e) of the Act, this court cannot consider any 'objection that has not been urged before the Board . . . unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances.'" *Tschiggfrie Props.*, 896 F.3d at 885 (ellipses in original) (quoting 29 U.S.C. § 160(e)). "[T]he Board must receive adequate notice of the basis for the objection[,]" and "[t]he test is whether the objection, fairly read, apprises the Board that the objector intended to pursue the issue later presented to the court." *Id.* (first alteration in original) (quoting *St. John's Mercy Health Sys. v. NLRB*, 436 F.3d 843, 848 (8th Cir. 2006)).

At oral argument, Dolgencorp conceded it did not specifically raise a legal challenge to the application of *Ideal Electric*'s critical-period principle before the Board. Dolgencorp argued it nevertheless preserved the issue by consistently raising the "general point" that the alleged tire-slashing threat was a basis for setting aside

the election. Raising this general point, however, is not necessarily sufficient. *See Tschiggfrie Props.*, 896 F.3d at 885 ("It is not necessarily enough to generally object to a finding."). And, read fairly, neither Dolgencorp's exceptions to the Hearing Officer's report nor its request for review of the Regional Director's decision apprised the Board of Dolgencorp's intent to pursue a challenge to the application of *Ideal Electric. See id.* at 885; 29 C.F.R. § 102.46(a)(1)(2) ("Any exception to a ruling, finding, conclusion, or recommendation which is not specifically urged will be deemed to have been waived."). Those filings do not mention *Ideal Electric* or discuss the appropriate application of the critical-period principle.[1] Under these circumstances, section 10(e) of the Act bars us from considering whether the Board correctly applied *Ideal Electric. NLRB v. RELCO Locomotives, Inc.*, 734 F.3d 764, 795 (8th Cir. 2013) (stating section 10(e) of the Act is a "jurisdictional bar").

## E. Second Objection

We next address the Board's decision to overrule Dolgencorp's second objection. The Board accepted the Hearing Officer's decision to credit Price's testimony over Durlin's and found Price did not attempt to bribe Durlin for her vote but offered her an unconditional $100 loan. It then concluded "such conduct is not objectionable." Dolgencorp argues the Board's credibility determination and conclusion are not supported by substantial evidence. It also argues the Board applied the wrong legal standard to this conduct.

Durlin signed an authorization card, made pro-union comments in the group text message conversation set up by Myers, and never indicated to Price she no longer

---

[1]Neither party addressed whether *Ideal Electric* is consistent with this court's directive in *NLRB v. Earle Industries, Inc.* that the temporal proximity of the misconduct to the election date *must* be considered. 999 F.2d 1268, 1273 (8th Cir. 1993) ("[T]he lapse of time between the alleged incidents of misconduct and the election date is a factor that *must* be considered.") (emphasis added).

-12-

supported Union representation. Thus, the Hearing Officer found there was no evidence Price "had to bribe Durlin for a yes vote." Further, Price testified he offered Durlin the loan because she told him she was upset and stressed about finances after Dolgencorp cut her hours, and Durlin acknowledged she was concerned about finances at that time. Thus, the Hearing Officer also found Price's account was consistent with other evidence. The Board concluded there was no basis in the record for reversing the Hearing Officer's credibility determinations.

"We will not displace the Board's choice between two fairly conflicting views, even if we would have made a different choice had the matter been before us de novo." *Int'l All. of Theatrical Stage Emps. v. NLRB*, 885 F.3d 1123, 1127 (8th Cir. 2018) (citing *Midwest Precision Heating & Cooling, Inc. v. NLRB*, 408 F.3d 450, 458 (8th Cir. 2005)). We will only do so when the Board's determination lacks substantial evidence on the record as a whole. *Town & Country*, 106 F.3d at 819. Here, there is substantial evidence to support the factual finding that Price offered Durlin an unconditional $100 loan to help her with personal finances. *See id*.

The fact that the loan was unconditional, however, does not mean it had no impact on Durlin's vote. *See NLRB v. Savair Mfg. Co.*, 414 U.S. 270, 280 (1973). Unconditional or not, the loan must be considered under the applicable legal standard. And as to the applicable legal standard, the Board evaluated Price's offer under its standards for nonthreatening third-party conduct, citing *Cornell Forge Co.*, 339 N.L.R.B. 733 (2003). In *Cornell Forge*, the Board evaluated threatening and nonthreatening conduct under different standards. *Id.* at 734. For nonthreatening third-party conduct, the Board determines whether the conduct "substantially impair[ed] the employees' exercise of free choice." *Id.* At oral argument, Dolgencorp stated it was aware of only one case involving a financial benefit conferred by one third-party employee to another, *Tio Pepe, Inc.*, 263 N.L.R.B. 1165 (1982). The Board applied a similar standard in *Tio Pepe*, finding the financial

benefit at issue "significantly impaired the fairness of the election[.]" *Id.* at 1166 n.4.[2] And Dolgencorp explicitly advocated for the substantially-impaired standard in both its exceptions to the Hearing Officer's report and its request for review of the Regional Director's decision, arguing the $100 offer "substantially impaired" Durlin's exercise of free choice. Thus, we cannot now consider Dolgencorp's argument that some other standard applies. *See Tschiggfrie Props.*, 896 F.3d at 885.

Ultimately, the Board concluded Price's offer of an unconditional $100 loan was "not objectionable." We interpret this to mean the loan did not substantially impair Durlin's exercise of free choice. But because the Board's conclusion requires interpretation, we feel compelled to address an important rule of administrative law before addressing whether it is supported by substantial evidence: "A court '"may not supply a reasoned basis for the agency's action that the agency itself has not given" . . . . however, [the Court will] "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned."'" *Nebraska v. U.S. EPA*, 812 F.3d 662, 666 (8th Cir. 2016) (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983) (alterations in original)); *accord SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947) ("If the administrative action is to be tested by the basis upon which it purports to rest, that basis must be set forth with such clarity as to be understandable.").

The section of the Board's final order addressing Price's loan offer lacks ideal clarity. The Board stated "Price offered to lend employee Joanna Durlin $100" and found "that such conduct is not objectionable." Without more, we would be unable to review this aspect of the Board's action for substantial evidence. *See Chenery*, 332 U.S. at 196.

---

[2]It is worth noting the Board found that the third-party employees in *Tio Pepe* "made offers of financial benefit [to other employees] *in exchange for union support* . . . ." 263 N.L.R.B. at 1166 n.4 (emphasis added). In this case, however, the Board found Price's offer was not conditioned on support for the Union.

When read in context with the remainder of its order, however, the Board's rationale can be reasonably discerned.  The Board began its analysis of the loan offer by noting the Hearing Officer credited Price's testimony that he offered Durlin an unconditional $100 loan.[3]  And previously in its order, after determining Price was not a Union agent, the Board expressly stated it was examining all of Price's "conduct using [its] standards for third-party conduct."   As noted above, the Board contemporaneously cited *Cornell Forge*, which articulates the standard applicable to nonthreatening third-party conduct — the conduct must "substantially impair the employee[' s] exercise of free choice."  339 N.L.R.B. at 734.  Based on its adoption of the Hearing Officer's credibility determination and its citation to *Cornell Forge*, the Board's rationale can be reasonably discerned, i.e. Price's offer of an unconditional $100 loan to Durlin was not objectionable because it did not substantially impair Durlin's free choice in the election.  *See, e.g.*, *id*. (finding prounion employees' nonthreatening speech was "not objectionable" because it did not "substantially impair [other] employees' exercise of free choice").

This rationale is also consistent with the Board's discussion of two prior cases in its analysis of the loan offer.  The Board first discussed footnote four in *Tio Pepe* where the Board similarly evaluated the effect of a third-party financial inducement under a "significantly impaired the fairness of the election" standard.  263 N.L.R.B. at 1165 n.4.  The Board then discussed  *Savair Manufacturing Co.*, treating that case as also applying the same impairment-of-free-choice standard.  414 U.S. at 278–80.  This further indicates that the Board evaluated Price's unconditional loan offer under the substantial-impairment standard and determined the loan did not substantially impair Durlin's free choice in the election.  Although the Board concluded these two cases were ultimately "not instructive," it reached that conclusion not based on the

[3]In footnote two of its order, the Board declined to reverse any of the Hearing Officer's credibility determinations.

-15-

legal standard applied but because both cases involved financial inducements *conditioned on* union support — a fact not present in this case.

Moreover, there is less danger of transgressing *Chenery* because the Act explicitly provides reviewing courts the authority to modify an order of the Board. 29 U.S.C. § 160(e); *cf. Pattison Sand Co., LLC v. Fed. Mine Safety & Health Review Comm'n*, 688 F.3d 507, 516 (8th Cir. 2012) (explaining *Chenery* "reflected a concern about courts entering a 'domain which Congress has set aside exclusively for the administrative agency'" and that "there is less danger of that" where Congress explicitly provides the authority to modify orders) (quoting *Chenery*, 332 U.S. at 196).

Dolgencorp does not make an argument under *Chenery*, but it attributes a different rationale to the Board's order. Dolgencorp posits that the Board never determined whether Price's loan offer substantially impaired Durlin's free choice in the election but simply found that "the [loan] offer was not objectionable because it was not made by the Union." However, attributing this rationale to the Board's order overlooks the significance of the unconditional nature of the loan. The Board adopted the Hearing Officer's decision to credit Price's testimony regarding the unconditional nature of the loan, and this was a factor in both the Hearing Officer's and the Board's analyses. Accordingly, we do not understand the Board's order as overruling Dolgencorp's second objection based solely on the fact that Price's conduct was not attributable to the Union.

Turning to the merits of the Board's conclusion, we find it is supported by substantial evidence. Again, Durlin signed an authorization card, made pro union comments, participated in Myers's group text message conversations, and then — consistent with this prior conduct — voted in favor of Union representation. Based on the record as a whole, a reasonable mind might accept the Board's conclusion that Price's offer of an unconditional $100 loan did not substantially impair Durlin's

exercise of free choice in the election. *See ConAgra Foods*, 813 F.3d at 1084. Therefore, we will not disturb the Board's decision to overrule Dolgencorp's second objection.

### III. Conclusion

For the reasons stated, we deny Dolgencorp's petition for review and grant the Board's petition for enforcement.

—————————————————